
FILED
COURT OF APPEALS DIV I
STATE OF WASHINGTON

2014 OCT 13 AM 9: 04

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 70520-2-I |
| Respondent, | ) | |
| v. | ) | UNPUBLISHED OPINION |
| DEREK JOHN CARTMELL, | ) | |
| Appellant. | ) | FILED: October 13, 2014 |

LEACH, J. — Derek Cartmell appeals his convictions for possession of a stolen vehicle, attempting to elude a pursuing police vehicle, possession of a controlled substance, and hit and run (property damage). He challenges the trial court's admission of certain evidence, including his Department of Corrections (DOC) identification card, the testimony of his DOC community corrections officer, and phone calls and text messages retrieved from his cell phone. He also alleges prosecutorial misconduct committed by making improper argument and shifting the burden of proof. And in a statement of additional grounds, he questions the validity of search warrants police officers obtained before searching the backpack and phone left in the stolen vehicle. Because the trial court did not abuse its discretion in admitting evidence, the prosecutor did not commit misconduct, and Cartmell's claims in his statement of additional grounds have no merit, we affirm.

FACTS

Near Oak Harbor, on November 1, 2012, at about 9:00 a.m., Washington State Patrol Trooper David Martin attempted to pull over a speeding pickup truck. When the truck sped away, Martin followed in pursuit. The ensuing high-speed chase ended when the truck struck a house.

By the time Martin parked his patrol car, the truck's driver had fled on foot. Neither Martin nor the homeowner got a good look at his face.

Other law enforcement officers and the owner of the truck, Michael Hurley, arrived at the scene. Hurley reported the truck stolen earlier that morning. Hurley consented to an initial search of the truck, and officers found a backpack and a red Samsung cell phone. After obtaining search warrants, officers searched these items and found a wallet containing Derek Cartmell's social security card, driver's license, DOC identification card, and Quest card.[1] Police also searched a second cell phone found in the backpack. The Samsung cell phone revealed phone calls and text messages, the last of which was read approximately 10 minutes before the collision. Police also recovered two glass pipes used for narcotics, two small "baggies" containing suspected narcotics, and a license plate.

---

[1] A Quest card is an electronic benefits transfer (EBT) card, similar to a debit card that the Department of Social and Health Services issues to clients receiving food assistance. http://www.dshs.wa.gov/onlinecso/ebt.shtml.

The State charged Cartmell with possession of a stolen vehicle, attempting to elude a pursuing police vehicle, possession of a controlled substance (methamphetamine), and hit and run (property damage). Before trial started, Cartmell moved to exclude any reference to his DOC identification card and the testimony of his DOC community custody officer, Helen Desmond. Cartmell also sought to exclude 163 phone calls and text messages stored on the cell phone. The trial court denied the motions. The court gave the jury oral limiting instructions before the introduction of the DOC card and Desmond's testimony, as well as a written limiting instruction before deliberations.

The jury convicted Cartmell as charged. He appeals.

ANALYSIS

DOC Evidence

Cartmell contends first that the trial court abused its discretion by admitting his DOC card and Officer Desmond's testimony. Because his wallet contained four types of identification, he asserts the DOC card was "at best" cumulative evidence. He claims the DOC card "stigmatized [him] as a felony offender." As a result, the danger of unfair prejudice caused by its admission substantially outweighed its probative value and ER 403 required its exclusion. He makes similar claims about Desmond's testimony, contending that both "labeled the accused as a felony offender on State supervision, overwhelming

the jury's ability to weigh the evidence" and "encourag[ing] the jury to use propensity reasoning." Cartmell describes the court's limiting instructions as "wholly inadequate" to limit this evidence's prejudicial effect.

We review a trial court's decision about the admissibility of evidence under an abuse of discretion standard. Unless the court made a manifestly unreasonable decision or based it on untenable grounds or reasons, we affirm.[2]

Washington Rules of Evidence provide for the admission of all relevant evidence unless an applicable constitutional requirement, statute, rule, or regulation limits its admission.[3] ER 401 defines "[r]elevant evidence" as evidence having a tendency to make the existence of any fact consequential to the resolution of an action more or less probable than it would be without that evidence. A trial court may exclude even relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice."[4] But "nearly all evidence will prejudice one side or the other," and "[e]vidence is not rendered inadmissible under ER 403 just because it may be prejudicial."[5] The trial court sits in the best position to determine the prejudicial effect of evidence.[6] And the chance that the harm of unfair prejudice will substantially outweigh the probative

---

[2] State v. Stenson, 132 Wn.2d 668, 701, 940 P.2d 1239 (1997); State v. Luvene, 127 Wn.2d 690, 706-07, 903 P.2d 960 (1995).
[3] ER 402.
[4] ER 403.
[5] Carson v. Fine, 123 Wn.2d 206, 224, 867 P.2d 610 (1994).
[6] State v. Powell, 166 Wn.2d 73, 81, 206 P.3d 321 (2009).

force of evidence is "'quite slim' where the evidence is undeniably probative of a central issue in the case."[7] Although a court may exclude a "needless presentation of cumulative evidence," the admission of cumulative evidence is not necessarily prejudicial error.[8] Evidentiary error is not prejudicial "'unless, within reasonable probabilities, the outcome of the trial would have been materially affected had the error not occurred.'"[9]

Here, identity was the central issue. At trial, Cartmell argued that certain differences between Trooper Martin's physical description and descriptions on his identification cards created reasonable doubt. Though police recovered four forms of identification from Cartmell's wallet, only the driver's license and DOC card contained photos and physical descriptions. The photos showed Cartmell with different hair lengths, and the physical descriptions listed slightly different weights. Evidence of photo identification is "undeniably probative of a central issue" in such a case, which the trial court noted in its ruling:

> This is a circumstantial evidence case. The issue is who done it, as it were. This is an identity case. The primary issue is the identity of the person who committed the crimes . . . . [I]t would not be appropriate for the Court to limit the state in presenting the relevant

---

[7] Carson, 123 Wn.2d at 224 (quoting United States v. 0.161 Acres of Land, 837 F.2d 1036, 1041 (11th Cir. 1988)).

[8] ER 403; State v. Dunn, 125 Wn. App. 582, 589, 105 P.3d 1022 (2005) (citing State v. Todd, 78 Wn.2d 362, 372, 474 P.2d 542 (1970)).

[9] State v. Bourgeois, 133 Wn.2d 389, 403, 945 P.2d 1120 (1997) (quoting State v. Tharp, 96 Wn.2d 591, 599, 637 P.2d 961 (1981)).

evidence that it has on the issue of identity, and one of the relevant items would be the DOC offender card.

The court found that the DOC card's relevance "clearly outweigh[ed] any danger of unfair prejudice from any inference . . . that Mr. Cartmell was the subject of DOC supervision because of criminal activity." The court offered to redact the word "offender" from the card to limit its prejudicial impact, but defense counsel declined, telling the court, "Your Honor, I'm not sure, when it says the Department of Corrections over the top of it and clearly not an employee badge, that there's anything that one can do to the document to limit its prejudicial content." The court sought confirmation on this point, asking, "Do I understand, then, that you're not asking for any redaction from the document?" Defense counsel responded, "No, Your Honor, we're not." The court also suggested a limiting instruction and emphasized, "[T]he Court would certainly not permit any evidence of why this card was issued or what the crimes were that he was previously convicted of that required that he have an offender DOC card or something of that nature. There will be no evidence whatsoever of that."

Cartmell cites In re Personal Restraint of Glasmann[10] to support his claim about the unduly prejudicial effect of the DOC card. In that case, the prosecutor showed the jury a booking photograph of the defendant's face, on which the prosecutor had superimposed the word "guilty."[11] But Glasmann is inapposite.

---

[10] 175 Wn.2d 696, 286 P.3d 673 (2012).
[11] Glasmann, 175 Wn.2d at 705-06.

In that case, our Supreme Court did not reverse for evidentiary error but for flagrant and ill-intentioned prosecutorial misconduct "so pervasive that it could not have been cured by an instruction."[12] Here, the State offered the DOC card as issued, not altered to increase its prejudicial effect. Cartmell declined an opportunity to redact potentially prejudicial content. Moreover, the jury received information about Cartmell's criminal history through a different source. Cartmell testified in his own defense. During cross-examination, he acknowledged three convictions for crimes of dishonesty, two of which were felonies.[13]

The DOC card helped the State prove the central issue in the case, and Cartmell does not show the trial court abused its discretion by admitting it. He also fails to show a reasonable probability that the outcome of his trial would have been materially affected had the court excluded it.

Cartmell also challenges the trial court's admission of DOC Officer Helen Desmond's testimony. Desmond identified herself as a community corrections officer who receives contact information from "particular people," including Cartmell. Desmond testified about emergency contact information she kept as Cartmell's community custody officer, which matched telephone numbers found on the contacts list in the seized cell phone.

---

[12] Glasmann, 175 Wn.2d at 707.
[13] Two convictions were for possession of stolen property in the second degree, a class C felony. RCW 9A.56.160.

Cartmell argues that Desmond's testimony was cumulative evidence because he "had already conceded that the phone belonged to him and the contact list inside the phone was his." But at the time Desmond testified, Cartmell had only offered to stipulate that "the phone was his at one time," and he later testified that someone stole it from him. Desmond's testimony directly linking the phone to Cartmell was highly probative of the central issue of the case. Before Desmond testified, the court instructed the jury that it could consider Desmond's evidence "only for the purpose of identification." And here again, any danger of unfair prejudice was neutralized by Cartmell's testimony about his criminal history, which eliminated any juror speculation about why he had a community corrections officer. The court did not abuse its discretion in admitting Desmond's testimony.

Text Messages and Phone Calls

The trial court admitted a 20-page document that included the dates and times of 163 text messages and phone calls sent from and received by the cell phone over approximately an 18-hour period, plus the content of a number of text messages. First, Cartmell contends the text messages were inadmissible hearsay. He argues further that the trial court should have excluded them as "irrelevant, cumulative, and substantially more prejudicial than probative." In addition to objecting before trial to the admission of all the text messages, at trial

Cartmell objected specifically to several messages as prejudicial. The trial court noted Cartmell's standing objection but admitted the information "for the limited purposes of identification and to show the context of the statements made by the owner of the phone."

ER 801(c) defines "hearsay" as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." It is not admissible unless an exception applies.[14]

Because the State did not offer the text messages to prove the truth of the statements contained in them, they were not hearsay. Although Cartmell asserts that the State's aim in offering the messages was to prove the truth of the senders' portrayals of Cartmell as "a lying, womanizing, unreliable 'player,'" the trial court admitted the phone call and text message information only to allow the State to "reasonably argue that this was Mr. Cartmell's phone." Before the State introduced the document, the court instructed the jury that it "may consider the evidence only for the purpose of identification." The court gave the same written instruction before deliberations. And in response to a question from the deliberating jury, the court reiterated, "You may use Exhibit 40 with regard to the issue of the identity of the person who allegedly committed the crimes

---

[14] ER 802.

charged . . . and for no other purpose. You may not consider Exhibit 40 for the truth of the contents of the statements in Exhibit 40."

Moreover, as the trial court also ruled, text messages that Cartmell sent were admissible and not hearsay because they were statements of a party opponent:

> Any statements made by the person who owned this phone, which the state's theory is that it was the defendant, Derek Cartmell, would be admissible as substantive evidence, not hearsay.
> Hearsay does not include statements by a party opponent. So those statements are all admissible by the possessor of the phone, as outlined in this document.[15]

The messages were highly probative of the central issue: the identity of the person in possession of the phone at the time of the chase and collision. Several incoming text messages address "Derek," and the senders obviously believed that they were communicating with the owner of the phone. Several lengthy text message conversations imply an intimate relationship between Cartmell and the other party to the conversation, supporting the State's assertion that "[t]he implication is that [Cartmell is] the one using the phone all the way up until ten minutes to nine in the morning." The last outgoing text message before the police seized the phone was sent at 8:52 a.m.—shortly before the truck

---

[15] ER 801(d)(2)(i) (An admission by a party opponent is a statement "offered against a party and is . . . the party's own statement, in either an individual or representative capacity.").

collided with the house. The trial court properly admitted the text messages as nonhearsay evidence of identity.

Many of the text messages unquestionably portray Cartmell in an unfavorable light. They contain strong sexual content, numerous profanities, language that arguably could refer to illegal activity, and one offensive racial reference. But evidence is not inadmissible under ER 403 just because it may be prejudicial. This evidence was highly probative of identity, the contested issue in the case. Because the trial court has considerable discretion in administering ER 403, a reviewing court will find reversible error "only in the exceptional circumstance of a manifest abuse of discretion."[16] The court did not abuse its discretion by admitting the text messages and phone calls.

Prosecutorial Misconduct

Cartmell also argues that prosecutorial misconduct violated his right to a fair trial. He contends that in closing argument, the prosecutor "emphasized the improperly admitted text messages, drawing the jury's attention to the prejudicial content." He asserts that the prosecutor "repeatedly misstated the law in closing argument, shifting the burden to the defense." And in a statement of additional grounds, Cartmell alleges that the prosecutor made statements that were "not consistent" with trial testimony and "without proper evidence."

---

[16] Carson, 123 Wn.2d at 226.

When a defendant did not object to the alleged prosecutorial misconduct at trial, this court does not review the alleged error unless the misconduct was so flagrant and ill intentioned that it caused prejudice incurable by a proper jury instruction.[17] Cartmell agrees that he made no specific objections during closing argument but claims he appropriately relied on his standing objection to the court's admission of the text messages. Cartmell correctly notes that if the court makes a final ruling on a motion, the parties may rely on that ruling without raising new objections during trial.[18] But Cartmell made a standing objection to the admission of the text messages, not the prosecutor's closing argument. He made no objection, standing or otherwise, to the prosecutor's alleged improper argument. Thus, the "flagrant and ill intentioned" standard applies, and Cartmell bears the burden of establishing that the challenged conduct was improper and prejudicial and could not have been cured by proper instruction. Prejudice occurs only if "'there is a <u>substantial likelihood</u> the misconduct affected the jury's verdict.'"[19] This court reviews misconduct claims in the context of the issues in the case, the total argument, the evidence, and the jury instructions.[20]

---

[17] <u>State v. Emery</u>, 174 Wn.2d 741, 760-61, 278 P.3d 653 (2012).

[18] <u>State v. Powell</u>, 126 Wn.2d 244, 256, 893 P.2d 615 (1995).

[19] <u>State v. Monday</u>, 171 Wn.2d 667, 675, 257 P.3d 551 (2011) (internal quotation marks omitted) (quoting <u>State v. Yates</u>, 161 Wn.2d 714, 774, 168 P.3d 359 (2007)).

[20] <u>State v. McKenzie</u>, 157 Wn.2d 44, 52, 134 P.3d 221 (2006).

Cartmell's misconduct claims fail. First, the prosecutor did not improperly discuss the text messages in closing argument. The prosecutor highlighted the timing and content of the text message conversations to show that Cartmell possessed the phone between the evening of October 31 and the morning of November 1. The content of the text messages was often offensive. But the prosecutor properly argued from the evidence to show identity—that "no one else can carry on that conversation. That's what's important about those conversations. That he convinced multiple people, male or female, that that's Derek Cartmell." The prosecutor did not introduce "irrelevant and inflammatory matter . . . , which has a natural tendency to prejudice the jury against the accused."[21]

Second, Cartmell calls burden-shifting a missing witness argument the State appropriately applied to the facts. In his testimony, Cartmell asserted that he and Angie, his children's mother, took their children trick-or-treating the night the truck was stolen. He testified that after trick-or-treating, he spent most of the night with his girl friend. And he testified that the next morning, around 9:20, he

---

[21] State v. Miles, 73 Wn.2d 67, 69-70, 436 P.2d 198 (1968) (improper and prejudicial to admit hearsay evidence alleging a plan by defendants to perpetrate a robbery like the one with which they were charged); see also State v. Belgarde, 110 Wn.2d 504, 507-08, 755 P.2d 174 (1988) (improper and prejudicial to describe American Indian defendant as a leader of a "deadly group of madmen" and "butchers [who] kill indiscriminately").

picked up his son from Angie's apartment and took him to school.[22]  On cross-examination, the prosecutor referred to Angie and several other women whom Cartmell identified as his girl friends and asked Cartmell, "Are any of them going to testify on your behalf today?" Cartmell responded, "No." In closing argument, the prosecutor referred to Cartmell's alibi, noting that "he could have called Angie to help him out. I was with Tina all night. That's great. Where is Tina?"

"A criminal defendant has no burden to present evidence, and it is error for the State to suggest otherwise."[23]  But the prosecutor may argue that the evidence does not support the defense theory of the case.[24]  And under the missing witness doctrine, the State may point out the absence of a "natural witness" when it would be reasonable to infer the witness's peculiar availability to the defendant, the materiality of the witness's noncumulative testimony, and the witness's absence is not otherwise explained.[25]  In this case, the State could argue, and the jury could infer, that the absent witness's testimony would not

---

[22] A school employee testified as a rebuttal witness that Angie phoned the school that day to excuse Cartmell's son because of illness and that the boy was absent all day.

[23] State v. Montgomery, 163 Wn.2d 577, 597, 183 P.3d 267 (2008) (citing State v. Cheatam, 150 Wn.2d 626, 652, 81 P.3d 830 (2003)).

[24] State v. Russell, 125 Wn.2d 24, 87, 882 P.2d 747 (1994); State v. Killingsworth, 166 Wn. App. 283, 291-92, 269 P.3d 1064, review denied, 174 Wn.2d 1007 (2012).

[25] Montgomery, 163 Wn.2d at 598-99 (citing State v. Blair, 117 Wn.2d 479, 485-86, 816 P.2d 718 (1991)).

have been favorable to the defendant.[26] In State v. Contreras,[27] the defendant testified that he spent the entire night with his girl friend and that they saw several acquaintances during the night. While the acquaintances testified at trial, the girl friend did not.[28] This court held that the prosecutor was entitled both to cross-examine the defendant and to comment in closing argument about the defendant's failure to call his girl friend as an alibi witness.[29] Here, as in Contreras, the missing witnesses had both a special relationship to the defendant and material information about the central issue in the case. The prosecutor's comment on their absence was proper argument that did not shift the burden of proof.

Cartmell challenges another remark as a misstatement of the law. In closing argument, the prosecutor told the jury,

> I want you to bear a couple things in mind when you listen to [defense counsel's] argument. Number one, in order to generate a reasonable doubt[,] there has to be a reasonable explanation. I was dropping off my son who didn't go to school that day is not reasonable. I was with Angie doesn't help us any, especially when he could have called Angie to help him out.

Cartmell contends that the prosecutor's statement that "in order to generate a reasonable doubt[,] there has to be a reasonable explanation" implied

---

[26] Montgomery, 163 Wn.2d at 598 (citing Blair, 117 Wn.2d at 485-86).
[27] 57 Wn. App. 471, 472-73, 788 P.2d 1114 (1990).
[28] Contreras, 57 Wn. App. at 473.
[29] Contreras, 57 Wn. App. at 475.

that "a defendant has a burden to offer an explanation" and amounted to impermissible burden-shifting. We disagree. In State v. Killingsworth,[30] the defendant made a similar claim, contending that the State improperly shifted the burden of proof by arguing that the only "reasonable explanation" for the evidence was the defendant's guilt. This court rejected that contention and affirmed, noting that the prosecutor "did not argue or imply that the defense had failed to offer other reasonable explanations or comment on Killingsworth's failure to testify. Rather, he simply argued that the evidence did not support any other reasonable explanation."[31] Here, as in Killingsworth, the prosecutor highlighted evidence that did not support a "reasonable explanation" other than Cartmell's guilt: lack of corroboration of Cartmell's overnight alibi; school personnel's rebuttal of his morning alibi that he was taking his son to school; his belongings, identification, and unexplained fingerprint in the stolen truck; and the numerous text messages that he apparently sent and received during the hours directly before the chase and collision.[32] The prosecutor properly argued inferences from the evidence, and his argument did not shift the burden of proof.

---

[30] 166 Wn. App. 283, 290 n.5, 269 P.3d 1064, review denied, 174 Wn.2d 1007 (2012).

[31] Killingsworth, 166 Wn. App. at 291.

[32] See Killingsworth, 166 Wn. App. at 291 ("If somebody offers you those two things for something less than $50, you know darn well it's stolen, and that's why you pawn it real fast. You don't buy something to pawn it. Nobody gives it to you in the middle of the night. There's no reasonable explanation for why—for how he would get this without knowing that it was stolen, either buying it too

Search Warrants

In a statement of additional grounds, Cartmell alleges that the trial court abused its discretion by "admitting evidence gained through faulty search warr[a]nt[s]" concerning the backpack and Samsung phone. He argues further that because he "was never identified being at the scene of the crime," the trial court should not have relied on certain abandonment cases where identity was not an issue.

Article I, section 7 of the Washington Constitution prohibits a warrantless search, subject to a limited set of exceptions.[33] One exception allows police to retrieve and search voluntarily abandoned property without implicating an individual's rights under the Fourth Amendment to the United States Constitution or article I, section 7.[34]

The search warrants that officers obtained before searching the backpack and cell phone contained several errors. Of two search warrants for the cell phones, both stated the wrong date of the alleged crime and one also named the wrong victims. Neither warrant described the phones with any particularity. Similarly, although the warrant to search the backpack described more

_____

cheaply or stealing it himself or knowing it was stolen in a stolen car and pawning it. That's trafficking.").

[33] State v. MacDicken, 171 Wn. App. 169, 174, 286 P.3d 413 (2012), aff'd, 179 Wn.2d 936, 319 P.3d 31 (2014).

[34] State v. Reynolds, 144 Wn.2d 282, 287, 27 P.3d 200 (2001).

particularly a "black and gray North Face backpack," it initially listed the wrong date and victims of the alleged offense.

In its evidentiary ruling, the trial court acknowledged these errors, emphasizing that its ruling depended not on the warrants but on the fact that the items were abandoned property. Cartmell attempts to distinguish his case from the abandonment cases the trial court cited.[35] He argues the police failure to make a positive identification of him as the owner of the backpack and cell phone at the time of the search makes his case different. But the propriety of the search does not depend on police identification of the owner but on whether the property was voluntarily abandoned. "Discarded property is voluntarily abandoned unless there is unlawful police conduct, and a causal nexus exists between that conduct and the abandonment."[36]   Here, Trooper Martin lawfully pursued a speeding driver, who collided minutes later with a house. Cartmell does not dispute that the person Martin saw flee the scene abandoned the truck and the items in it. The trial court did not err in finding that police properly retrieved the backpack and cell phone as abandoned property. Because the court did not rely on the

---

[35] The court cited, for example, State v. Serrano, 14 Wn. App. 462, 544 P.2d 101 (1975), Reynolds, and State v. Kealey, 80 Wn. App. 162, 907 P.2d 319 (1995).

[36] State v. Young, 86 Wn. App. 194, 201, 935 P.2d 1372 (1997) (citing State v. Whitaker, 58 Wn. App. 851, 856, 795 P.2d 182 (1990)).

search warrants that the police obtained, we need not address their validity on appeal.

## Cumulative Error

Cartmell argues that because of prosecutorial misconduct and the court's admission of "irrelevant, cumulative, and unduly prejudicial evidence," this court should reverse under the cumulative error doctrine. Under this doctrine, a combination of errors may deny the accused a fair trial even where any one of the errors viewed individually may not justify reversal.[37] Because Cartmell fails to show any error, we conclude that the cumulative error doctrine does not apply.

## CONCLUSION

Because the trial court did not abuse its discretion in admitting evidence, the prosecutor did not commit misconduct, and Cartmell's claims in his statement of additional grounds have no merit, we affirm.

_____
Leach, J.

WE CONCUR:

_____
                                    _____
                                    Cox, J.

---

[37] In re Pers. Restraint of Yates, 177 Wn.2d 1, 65-66, 296 P.3d 872 (2013).